REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2140

September Term, 2012

FRIENDS OF FREDERICK
COUNTY ET AL.
v.

TOWN OF NEW MARKET

Kehoe,
Hotten,
Nazarian,

JJ.

Opinion by Kehoe, J.

Filed: August 25, 2015

*Woodward, J., did not participate in the
Court's decision to designate this
opinion for publication pursuant to
Maryland Rule 8-605.1.

In this appeal, we consider whether the Circuit Court for Frederick County, the Honorable Theresa M. Adams, presiding, erred when it concluded that the comprehensive plan[1] for the Town of New Market complies with state law. The appellants are Friends of Frederick County, a non-profit community advocacy association, the Audubon Society of Central Maryland, Inc., and a number of individuals asserting either taxpayer or aggrieved party standing.[2] The appellee is the Town. Appellants present one issue which we have reworded:

> Does the Town's Comprehensive Plan comply with the requirements of Title 3 of Division I of the Land Use Article?

The circuit court answered "yes" to this question. We believe that the court was correct and will affirm its judgment.

## Background

The Town is a municipal corporation located in Frederick County. In 2005, the Town, through its town council, adopted a comprehensive plan (the "Plan"). On November 17, 2010, the Town amended the Plan by adding a water resources element and a municipal growth element (the "MGE"). Of particular relevance to the present appeal,

---

[1]Section 1-101(l) of the Land Use Article ("LU") defines the term "plan," including a comprehensive plan, as "the policies, statements, goals, and interrelated plans for private and public land use, transportation, and community facilities documented in texts and maps that constitute the guide for an area's future development." As the Court of Appeals has noted, the terms "general plan," "master plan," "comprehensive plan," and "community plan" are often used synonymously. *Mayor & Council of Rockville v. Rylyns*, 372 Md. 514, 558 n.24 (2002).

[2]*See Anne Arundel County v. Bell*, 442 Md. 539, 586 (2015) (Aggrieved parties do not have standing to contest comprehensive zoning ordinances).

the MGE proposed the annexation of various tracts of land adjacent to the present Town boundaries (the "Annexation Areas"). The Annexation Areas are currently zoned for agricultural uses or other low-intensity uses by the Frederick County Zoning Ordinance. The MGE proposes that, upon annexation, the Town will change the zoning classifications to permit higher-density residential and mixed commercial and industrial uses. {E. 182-83.} On October 12, 2011, the Town further amended the Plan by adopting three documents as part thereof: a 2011 Supplement, together with two addenda that we will refer to as the "2011 Supplement Documents." In sum, as of 2011, the Town's Plan consisted of: (1) the 2005 comprehensive plan document; (2) the 2010 MGE; (3) the 2010 Water Resources Element; and (4) the 2011 Supplement Documents. (Although we may refer to these components individually in this opinion, we will refer to them, as a whole, as the "Plan.")

The appellants do not agree with the proposal in the MGE that the Town annex and rezone the Annexation Areas. On February 14, 2011, that is, prior to the Town's adoption of the 2011 Supplement Documents, appellants filed a complaint in the Circuit Court for Frederick County contending that the town council failed to comply with various provisions of what was then Md. Ann. Code (2012) Article 66B[3] when it adopted

---

[3]While this case was pending before the circuit court, Article 66B was repealed and recodified as part of Division I of the Land Use Article by Chapter 426 of the Laws of 2012. Uncodified § 17 of Chapter 426 states:

That it is the intention of the General Assembly that, except as expressly
(continued...)

2

the MGE in 2010. Appellants requested that the circuit court: (i) declare the Plan, specifically its MGE component, invalid; (ii) declare any zoning or annexation completed while the invalid MGE was in force void and invalid; and (iii) enjoin the Town from taking any zoning or annexation actions until the Town had a proper Plan in place.

On May 11, 2012, that is, after the Town adopted the 2011 Supplement Documents, appellants filed an amended complaint. In the amended complaint, appellants again contended that the Plan, as adopted, was invalid because the Plan failed to comply with the then-existing state law requirements in several respects. (These contentions are essentially the same as some of those raised by appellants in this court, and will be discussed later in this opinion.)

In response, the Town filed a motion for summary judgment. The Town argued that its Plan satisfied the applicable legal requirements. In support of its argument, the Town attached a copy of the Plan, color-coded to indicate which sections of the Plan addressed the subject matter deficiencies complained of by appellants.

Appellants opposed the motion for summary judgment. They argued that the Plan's

---

[3](...continued)
provided in this Act, this Act shall be construed as a nonsubstantive revision, and may not otherwise be construed to render any substantive change in the law of the State.

Section 17 is consistent with long-standing Maryland law that the re-codification process does not effect a substantive change to the law. *See, e.g., Comptroller of Treasury v. Blanton*, 390 Md. 528, 538 (2006); *Md. Div. of Labor and Industry v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 422 (2001). In this opinion, we will refer to the relevant provisions of the Land Use Article.

alleged compliance with the statutory requirements was a matter of form rather than substance. They also asserted that the Plan was substantively so inadequate that it thwarted the intent of the Code's requirements.[4] {E. 436-37.} Appellants also alleged that there were "numerous material facts in genuine dispute" dealing with whether the Town complied with the Code. {E. 436.}

To support these contentions, appellants submitted affidavits from three experienced and qualified experts: Joseph R. Davis, a land use planner; Michael Siegel, an expert in the fields of local and regional fiscal planning and forecasting; and Jawahar Mehra, a traffic engineer. Messrs. Davis and Siegel opined that the Plan failed to satisfy specific requirements of the Land Use Article. For example, Mr. Davis stated in his affidavit that the Plan's forecasts for new road construction failed to take into account the development of the "Delaplaine" and the "Ganley" farms, which are part of the Annexation Area; that the Plan's calculations of the traffic capacities of existing roadways was inaccurate and flawed; and that the Plan failed to provide cost estimates for the construction of new roads, even though such costs can be calculated.

---

[4]Specifically, in their opposition, appellants contended:

> Smart Growth seeks to manage growth by limiting the location of growth to prevent urban sprawl, protect the environment, and to preserve green spaces and rural areas. It requires a determination of whether there is sufficient infrastructure to accommodate new growth and if not, what new infrastructure will be necessary and at what cost. It seeks to allow only growth that is actually needed to locate that growth so as to maximally utilize infrastructure to limit or obviate the need to construct costly new infrastructure to service the growth.

Mr. Siegel opined that the methodology used by the Town to calculate its foreseeable population growth was flawed; that the Plan failed to take into account the fiscal impact of maintaining, as opposed to building, new roads; and that the Plan failed to consider additional public safety expenses that would be required as a result of the development contemplated by the Plan.

For his part, Mr. Mehra concluded that the Plan's transportation element was deficient because (1) it relied upon erroneous data as to the capacities of existing roads; (2) it failed to consider the effect of the new development proposed by the Plan upon existing roadways; and (3) it did not contain cost estimates for new road construction even though such information is required by what is now LU § 3-105(b)(3)[5] and is available—in approximate terms—from the Maryland Department of Transportation.

After a hearing, the circuit court granted the Town's motion for summary judgment. In a written opinion, the court concluded that the case did not present contested issues of material fact but that the dispositive issue was one of law, namely, whether the Plan, as written, complied with the applicable requirements set out in the Land Use Article. The court concluded that the statutes in question were unambiguous and that the Plan satisfied them. Relevant to the issues raised on appeal, the court concluded that the relevant provisions of the Land Use Article required the Plan to enunciate "policy conclusions, and not the underlying facts and studies used to reach

[5]The text of LU § 3-105 is set out in note 10 of this opinion.

those conclusions." The court concluded its analysis by stating:

> Maryland courts are without authority to interfere with any exercise of the legislative prerogative within constitutional limits. *S. Easton Neighborhood Ass'n v. Town of Easton*, 387 Md. 468 (2005) (quoting *Heaps v. Cobb*, 185 Md. 372, 379 (1945)). It is inevitable that when a municipality proposes annexations or zoning reclassifications, there will likely be affected parties who object to the action. However, this Court does not retain the authority to supplant the policy decisions of the legislature and local municipalities when those municipalities have fully complied with state law. Any judicial substitution of zoning plans based on preference or opinion, even those of three experts supplied by the Plaintiffs, would be an impermissible infringement on the legislative function.

> It is true that the Smart Growth policies enacted by the Maryland legislature in recent years have created new burdens for municipal bodies in zoning action and land administration. However, this Court has reviewed the Plan and its amendments and determined that [the Town] has fully complied with the requirements set forth under the relevant zoning statutes under the Land Use Article. There are no remaining material factual disputes, and the Town's motion for summary judgment is granted.{E. 45-46.}

Appellants timely appealed. {E. 9.}

## Analysis

### I.

We review the grant of a motion for summary judgment *de novo*. *See Murray v. TransCare Maryland*, 203 Md. App. 172, 198-99 (2012), *aff'd* 431 Md. 225 (2013). In undertaking this exercise, we independently review the record in the light most favorable to the non-moving party to decide whether there are issues of material fact. *Wells Fargo Home Mortgage, Inc. v. Neal*, 398 Md. 705, 714 (2007).

We view the dispositive issue in this case to be one of statutory construction. As the Court of Appeals explained in *Stickley v. State Farm Fire*, 431 Md. 347, 358-59 (2013):

> The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology. In construing the plain language, a court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application. Statutory text should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory . . . . It is also clear that we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

> We analyze the contested provisions of Maryland's Insurance Article in the context of the statutory scheme and construe the plain language so that the various sections of the article do not conflict with one another. . . . In addition, the meaning of the plainest language is controlled by the context in which it appears. As this Court has stated, because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.

(Citations and quotation marks omitted.)

Finally, appellants are challenging the validity of a legislative act of the Town Council. The decision by the Town Council to approve the Plan carries with it a strong presumption of validity. *See, e.g., Anderson House v. Mayor & Council of Rockville*, 402 Md. 689, 723 (2008); *Mayor & Council of Rockville v. Rylyns*, 372 Md. 514, 535 (2002). Overcoming this presumption is not impossible but it is very difficult. A party seeking to

do so:

> carries the heavy burden of establishing, by clear and affirmative evidence, that [the ordinance] is invalid. Even where reasonable doubt exists, the [o]rdinance must be sustained. In other words, the legislature is presumed to have acted within its police powers so that if any state of facts reasonably can be conceived that would sustain [the ordinance], the existence of that state of facts as a basis for the passage of the [ordinance] must be assumed.

*Anderson House*, 402 Md. at 724 (citations and footnote omitted).

II.

In order to place appellants' contentions in context, we begin with an overview of the relevant statutory scheme, which is now found in Titles 1 and 3 of the Land Use Article.

*A. The Visions*

Preliminarily, all comprehensive planning efforts in Maryland are required to "implement" twelve principles or "visions" articulated in LU § 1-201[6] for land use

_____

[6] LU § 1-201 states in pertinent part:

Visions.
In addition to the requirements of § 3-201(a) and (b) of this article, a planning commission shall implement the following visions through the comprehensive plan described in Title 3 of this article:
(1) quality of life and sustainability: a high quality of life is achieved through universal stewardship of the land, water, and air resulting in sustainable communities and protection of the environment;
(2) public participation: citizens are active partners in the planning and implementation of community initiatives and are sensitive to their responsibilities in achieving community goals;
(3) growth areas: growth is concentrated in existing population and business centers, growth areas adjacent to these centers, or strategically

(continued...)

and community planning in this State. In a nutshell, the visions reflect a legislative

awareness that (1) past development in Maryland has too often been haphazard,

economically wasteful, and needlessly harmful to environmental and natural resources;

[6](...continued)
selected new centers;
(4) community design: compact, mixed-use, walkable design consistent with existing community character and located near available or planned transit options is encouraged to ensure efficient use of land and transportation resources and preservation and enhancement of natural systems, open spaces, recreational areas, and historical, cultural, and archaeological resources;
(5) infrastructure: growth areas have the water resources and infrastructure to accommodate population and business expansion in an orderly, efficient, and environmentally sustainable manner;
(6) transportation: a well-maintained, multimodal transportation system facilitates the safe, convenient, affordable, and efficient movement of people, goods, and services within and between population and business centers;
(7) housing: a range of housing densities, types, and sizes provides residential options for citizens of all ages and incomes;
(8) economic development: economic development and natural resource-based businesses that promote employment opportunities for all income levels within the capacity of the State's natural resources, public services, and public facilities are encouraged;
(9) environmental protection: land and water resources, including the Chesapeake and coastal bays, are carefully managed to restore and maintain healthy air and water, natural systems, and living resources;
(10) resource conservation: waterways, forests, agricultural areas, open space, natural systems, and scenic areas are conserved;
(11) stewardship: government, business entities, and residents are responsible for the creation of sustainable communities by collaborating to balance efficient growth with resource protection; and
(12) implementation: strategies, policies, programs, and funding for growth and development, resource conservation, infrastructure, and transportation are integrated across the local, regional, State, and interstate levels to achieve these visions.

and (2) that previous efforts at community planning in Maryland have too often been inadequate, poorly coordinated with planning efforts by neighboring jurisdictions, or simply non-existent. Section 1-201 requires planning commissions to "implement the . . . visions through the comprehensive plan."

*B. The Elements*

Section 3-101 of the Land Use Article requires municipal corporations to enact, adopt, amend, and execute a comprehensive plan, unless the municipal corporation elects to participate in the county plan.[7] LU § 3-102 describes "elements," i.e., specific topics relevant to sound planning, that each plan *must* contain, as well as other elements that a plan *may* contain.[8] Sections 3-103 through 3-113 describe in greater detail the elements

---

[7]LU § 3-101 states:

Plan required; municipal inclusion.
(a) *In general.* — A local jurisdiction shall enact, adopt, amend, and execute a plan in accordance with this division.
(b) *Municipal inclusion in county plan.* — A municipal corporation may be included as part of a county plan under this division if:
(1) the legislative body of the municipal corporation, by resolution directed to the legislative body of the county where the municipal corporation is located, indicates the intention to participate in the county plan; and
(2) the legislative body of the county approves the resolution.

[8]LU § 3-102 states in pertinent part (emphasis added):

Elements – Noncharter counties and municipal corporations.
(a) *Required elements.* — (1) The planning commission for a local jurisdiction <u>shall include in the comprehensive plan the following elements</u>:
(i) a community facilities element;

(continued...)

10

identified in LU § 3-102, and identify specific topics that each of the mandatory elements

must address. Particularly relevant to the issues before us are (1) the development

regulations element (§ 3-103);[9] the transportation element (§ 3-105);[10] and the municipal

---

[8](...continued)
(ii) an area of critical State concern element;
(iii) a goals and objectives element;
(iv) a land use element;
(v) a development regulations element;
(vi) a sensitive areas element;
(vii) a transportation element; and
(viii) a water resources element.
* * * *
(3) The plan for a municipal corporation that exercises zoning authority
shall include a municipal growth element.
* * * *
(b) *Permissive elements.* — (1) The planning commission for a local
jurisdiction may include in the plan additional elements to advance the
purposes of the plan.
(2) The additional elements may include:
(i) community renewal elements;
(ii) conservation elements;
(iii) flood control elements;
(iv) housing elements;
(v) natural resources elements;
(vi) pollution control elements;
(vii) the general location and extent of public utilities[.]
* * * *

[9]LU § 3-103 states (emphasis added):

Development regulations element.
(a) *In general*. — The development regulations element shall include the
planning commission's recommendation for land development regulations
to implement the plan.
(b) *Purpose*. — The development regulations element shall encourage:
(1) the use of flexible development regulations to promote innovative and

(continued...)

11

growth element (§ 3-112).[11] Finally, LU § 3-204[12] requires plans to "include" the

---

[9](...continued)
cost-saving site design and protect the environment; and
(2) within the areas designated for growth in the plan:
(i) economic development through the use of innovative techniques; and
(ii) streamlined review of applications for development, including permit review and subdivision plat review.

[10]Section 3-105 states (emphasis added):

Transportation element.
(a) *In general*. — The transportation element may include all types of:
(1) airways;
(2) highways or streets;
(3) railways;
(4) waterways;
(5) routings for mass transit; and
(6) terminals for individuals, goods, and vehicles related to airways, highways, railways, and waterways.
(b) *Required contents*. — The transportation element shall:
(1) propose, on a schedule that extends as far into the future as is reasonable, the most appropriate and desirable patterns for:
(i) the general location, character, and extent of channels, routes, and terminals for transportation facilities; and
(ii) the circulation of individuals and goods;
(2) provide for bicycle and pedestrian access and travelways; and
(3) include an estimate of the use of any proposed improvement.

[11]Section 3-112 states in pertinent part:

Municipal growth element.
(a) *In general.* — The municipal growth element shall include:
(1) the municipal corporation's:
(i) future municipal growth areas outside the existing corporate limits;
(ii) past growth patterns;
(iii) capacity of land areas available for development, redevelopment, and in-fill;
(2) the land area needed to satisfy demand for development at densities

(continued...)

12

elements and the visions that we have previously described.

[11](...continued)
consistent with long-term development policy;
(3) the relationship of the long-term development policy to a vision of the municipal corporation's future character;
(4) rural buffers and transition areas;
(5) protection of sensitive areas that could be impacted by development planned within the proposed municipal growth area;
(6) population growth projections;
(7) public services and infrastructure needed to accommodate growth within the proposed municipal growth areas, including those necessary for:
* * * *
(iv) public safety, including emergency medical response;
* * * *
(8) any burden on services and infrastructure for which the municipal corporation would be responsible for development in areas near to and outside of the proposed municipal growth area; and
(9) anticipated financing mechanisms to support necessary public services and infrastructure.
* * * *
Additionally, LU § 3-206 requires a municipality to consult with the county or counties within which it is located regarding the municipal growth element.

[12]LU § 3-204 states:

Plan adoption.
(a) *In general.* — Each local jurisdiction shall adopt a plan that includes:
(1) the elements required under Subtitle 1 of this title; and
(2) the visions set forth in § 1-201 of this article.
(b) *Adoption of regulations.* — (1) Except as provided in paragraph (2) of this subsection, only a legislative body that has adopted a plan may adopt regulations implementing the visions stated in § 1-201 of this article in the plan.
(2) This subsection does not limit the Department of Planning from exercising any authority granted under the State Finance and Procurement Article.

## III.

To this court, appellants present a multi-step argument as to why the circuit court's judgment was in error. First, appellants contend that Maryland case law "establish[es] that comprehensive plans are more than mere guides consisting only of policy statements." Second, appellants argue that state law has transformed comprehensive plans into regulatory devices. Third, based upon these premises, appellants assert that the "language and purpose of the relevant statutory provisions require that comprehensive plans contain substantive factual determinations, not merely policy statements." Finally, appellants argue that the circuit court erred in granting summary judgment because the affidavits of their experts demonstrate that there are disputes of fact as to the sufficiency of the Plan.

We do not agree with appellants. It is not necessary for us to decide whether decisions by this Court or the Court of Appeals have had the effect changing the essential nature of comprehensive plans from advisory to regulatory. This is because we conclude that legislation enacted in response to the Court of Appeals' decision in *Trail v. Terrapin Run,* 403 Md. 523, 574 (2008), rendered some aspects of comprehensive plans regulatory, instead of advisory, in nature. However, we find no basis in either case law or any relevant statute to support appellants' contentions that comprehensive plans must include data to support a plan's goals, policies and recommendations. Our conclusions render irrelevant appellants' contentions that New Market's Plan is deficient because it

14

does not contain specific categories of information.

*A. Comprehensive Plans: Advisory or Regulatory?*

As a general rule, comprehensive plans "'which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statutes or local ordinances linking planning and zoning. Where the latter exists, however, they serve to elevate the status of comprehensive plans to the level of true regulatory devices.'" *HNS Dev. v. Baltimore County*, 425 Md. 436, 457-58, (2012) (quoting *Mayor & Council of Rockville v. Rylyns*, 372 Md. 514, 530 (2002)). Whether a plan is a guide or a regulatory device is generally a matter of statutory interpretation, to which the canons of statutory construction apply. *Maryland-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 101 (2009); *Richmarr Holly Hills v. American PCS*, 117 Md. App. 607, 636 (1997).

For a considerable period, there was uncertainty as to whether statutory requirements that local government land use actions be "consistent" with a comprehensive plan rendered the plan "a true regulatory device." In *Trail v. Terrapin Run,* 403 Md. at 574, and in the context of a special exception proceeding, the Court of Appeals held that the term did not have that effect.

The reaction of the General Assembly was swift and decisive. In the next legislative session, the legislature passed the "Smart, Green, and Growing – Smart and Sustainable Growth Act of 2009," enacted as Chapter 181 of the 2009 Laws of

Maryland.[13] For the purposes of our analysis, and among other things, Chapter 181 added

what is now codified as Title 1, Subtitle 3 of the Land Use Article,[14] and amended what

---

[13]Uncodified section 3 of Chapter 181 stated that "it is the intent of the General Assembly that this Act overturn the Court of Appeals' ruling in David Trail, et al. v. Terrapin Run, LLC et al., 403 Md. 523 (2007)."

[14]Subtitle 3 is entitled "Consistency" and provides in pertinent part as follows (emphasis added):

§ 1-301. "Action" defined.
In this subtitle, "action" means:
(1) the adoption of a local law or regulation concerning:
(i) a special exception under § 1-101(p) of this title (Definitions--"Special exception"); or
(ii) plan implementation and review under . . . § 3-303 of this article[.]
* * * *

§ 1-302. Scope of subtitle.
This subtitle applies to:
(1) a special exception under § 1-101(p) of this title (Definitions--"Special exception");
(2) plan implementation and review under . . . § 3-303 of this article;
(3) §§ 9-505(a)(1), 9-506(a)(1), and 9-507(b)(2) of the Environment Article (Water and sewer plan review); and
(4) § 4-414(c) of the Local Government Article (Annexation plan).

§ 1-303. Consistency--General requirement.
[W]hen a provision in a statute listed under § 1-302 of this subtitle requires an action to be "consistent with" or have "consistency with" a comprehensive plan, the term shall mean an action taken that will further, and not be contrary to, the following items in the plan:
(1) policies;
(2) timing of the implementation of the plan;
(3) timing of development;
(4) timing of rezoning;
(5) development patterns;
(6) land uses; and

(continued...)

16

is now LU § 3-303.[15] One effect of LU §§ 1-302 and 1-303 is that a special exception

application must "further, and not be contrary to" provisions of the application

comprehensive plan regarding matters such as the timing of future development, the

pattern of future development, land uses, and development densities. Additionally, LU

§§ 1-302 and 3-303, when read together, require that zoning regulations, subdivision

regulations and similar statutes must "further, and not be contrary to" provisions of the

jurisdiction's comprehensive plan that implement the visions set out in LU § 1-201 as

well as the elements of the plan addressing development regulations and sensitive areas.

Further elaboration on this point is not necessary for us to conclude that, with respect to

---

[14](...continued)
(7) densities or intensities.

[15]LU § 3-303 provides (emphasis added):

Periodic review; implementation.
(a) *Required review.* — <u>At least once every 10 years</u>, which corresponds to the comprehensive plan revision process under § 3-301 of this subtitle, <u>a local jurisdiction shall ensure the implementation of the visions, the development regulations element, and the sensitive areas element of the plan</u>.

(b) *Implementation.* — A local jurisdiction shall ensure that the implementation of the requirements of subsection (a) of this section are achieved through the adoption of the following applicable implementation mechanisms that are <u>consistent with the comprehensive plan</u>:
(1) <u>zoning laws</u>;
(2) <u>planned development ordinances and regulations</u>;
(3) <u>subdivision ordinances and regulations</u>; and
(4) <u>other land use ordinances and regulations</u>.

significant aspects of local government land use regulation, comprehensive plans have indeed been "elevate[d] . . . to the level of true regulatory devices.'" *HNS Dev*, 425 Md. at 457–58. At this point, however, our analysis parts company with appellants' contentions.

*B. Are Comprehensive Plans Required to Contain Data-based Determinations?*

In support of their contention that "both the language and the purpose of the relevant statutory provisions compel the conclusion that the Plan is to contain factually-based substantive determinations," appellants rely primarily upon LU § 3-112,[16] which sets out the matters that must be addressed in a comprehensive plan's municipal growth element, and LU § 1-201,[17] which articulates the visions that a local planning commission "shall implement . . . through the comprehensive plan[.]" We do not believe that the text of either statute, considered either in isolation or in the context of the larger statutory scheme, supports appellants' contentions.

First, § 3-112 requires a plan's municipal growth element to "include" matters such as the "capacity of lands available for development, redevelopment, and in-fill," § 3-112(a)(1)(iii), and "the land area needed to satisfy demand for development at densities consistent with long-term development policy," § 3-112(a)(2). Section 1-201 requires commissions to "implement" the visions through the comprehensive plan. The

---

[16]The pertinent text of LU § 3-112 is set out in note 11 *supra*.

[17]The pertinent text of LU § 1-201 is set out in note 6 *supra*.

Land Use Article does not contain definitions of either "include" or "implement." "Include" is defined as "[t]o contain as a part of something." B. Garner, BLACK'S LAW DICTIONARY (10th Ed., 2009). "Implement" is defined as "to carry into effect: to fulfill; to accomplish[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) at 1134. The dictionary definitions of neither "include" nor "implement" support appellants' contention that the statutes in question require a local planning commission to include detailed factual analyses as part of the plan.

Recourse solely to a dictionary is not the only way, nor indeed usually the best way, by which a court can discern legislative intent.[18] For that reason, courts do not normally view statutory language in isolation but rather consider it "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Mummert v. Alizadeh*, 435 Md. 207, 213 (2013) (citation omitted). When we look at the terms "include" and "implement" in the context of the larger statutory scheme, we conclude that neither term has the meaning that appellants suggest.

---

[18] As the Honorable Richard Posner observed: "'the choice among meanings [of words in statutes] must have a footing more solid than a dictionary—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures.'" *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012) (quoting Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J. L. & PUBLIC POLICY 61, 67 (1994)).

In this larger context, LU § 3-201[19] is relevant. Section 3-201(a) requires planning

―――――――――

[19]LU § 3-201 states in pertinent part:

Plan preparation.
(a) In general. — (1) A planning commission shall prepare a plan by carefully and comprehensively surveying and studying:
(i) the present conditions and projections of future growth of the local jurisdiction; and
(ii) the relation of the local jurisdiction to neighboring jurisdictions.
(2) A planning commission shall make the plan with the general purpose of guiding and accomplishing the coordinated, adjusted, and harmonious development of the local jurisdiction and its environs.
(3) The plan shall serve as a guide to public and private actions and decisions to ensure the development of public and private property in appropriate relationships.
(b) Scope and purposes of plan. — (1) In accordance with present and future needs, a plan shall promote:
(i) good civic design and arrangement;
(ii) a healthy and convenient distribution of population;
(iii) the health, safety, and general welfare of the local jurisdiction; and
(iv) efficiency and economy in the development process.
(2) A plan shall:
(i) include any areas outside the boundaries of the plan that, in the planning commission's judgment, relate to the planning responsibilities of the commission; and
(ii) provide for:
1. transportation needs;
2. the promotion of public safety;
3. light and air;
4. the conservation of natural resources;
5. the prevention of environmental pollution;
6. the wise and efficient expenditure of public funds;
7. adequate public utilities; and
8. an adequate supply of other public requirements.
(c) Implementation of visions. -- In addition to the requirements for the plan under Subtitle 1 of this title, a planning commission shall implement through the plan the visions set forth in § 1-201 of this article.
* * * *

commissions to prepare comprehensive plans "by carefully and comprehensively surveying and studying" present and future conditions within the jurisdiction and the relationship of the jurisdiction to neighboring jurisdictions. This is the only provision in the Land Use Article that addresses the means by which plans should be prepared. That a plan must be based upon careful and comprehensive study does not mandate use of particular methodologies or analytical techniques. Similarly, LU § 3-202(b)(1) provides that the elements of a plan "may be expressed in words, graphics, or any other appropriate form." This language falls far short of a requirement that a plan must contain data-based analyses to support the plans' conclusions and recommendations. We conclude that the relevant statutory provisions do not support appellants' contentions that the Land Use Article requires planning commissions to use specific analytical techniques much less that plans, in their final approved and adopted forms, must contain discussions of such data.

Appellants' contention that decisions by Maryland's appellate courts support their position is equally unavailing. Appellants concede, as they must, that the Town's planning commission acted in a quasi-legislative role in preparing the Plan and that the town council exercised its legislative authority when it approved the Plan. *See Anderson House, v. Mayor & Council of Rockville*, 402 Md. 689, 723 (2008) ("Comprehensive rezoning is a vital legislative function, and in making zoning decisions during the comprehensive rezoning process, the [zoning authority] is exercising what has been

21

described as its 'plenary' legislative power." (quoting *Stump v. Grand Lodge of Ancient, Accepted and Free Masons*, 45 Md. App. 263, 269 (1980) (bracketed material added by *Anderson House*)); *County Comm'rs v. Gaster*, 285 Md. 233, 249 (1979) (Adoption of a county comprehensive plan was "pursuant to legislative authority" vested in the county commissioners.).

Because the planning commission and the town council were acting, respectively, in quasi-legislative and legislative capacities, neither body was obligated to create a record to provide a basis for its decision. *See Union Investors v. Montgomery County*, 244 Md. 585, 588-89 (1966) (A county council is not required to hold an evidentiary hearing before acting in a legislative capacity.); *Lewis v. Gansler*, 204 Md. App. 454, 481-82 (2012) (The Critical Area Commission is "under no obligation to create a record to support its decision" when discharging a quasi-legislative function.); *1000 Friends of Maryland v. Ehrlich*, 170 Md. App. 538, 550 (2006) (The Board of Public Works is not required to make findings of fact before rendering a decision in a quasi-legislative proceeding.). If the planning commission and the town council were not obligated to create an evidentiary record to support their decisions to adopt the Plan, then *a fortiori*, the text of the Plan itself need not contain such information.[20]

---

[20]The circuit court's opinion also suggested that subjecting New Market's Plan to the sort of review proposed by appellants might raise separation of powers concerns. We decline to address the constitutional issue because this case can be decided on non-constitutional grounds. *See, e.g., VNA Hospice of Maryland v. Dep't of Health & Mental Hygiene*, 406 Md. 584, 604-05 (2008) ("This Court has emphasized, time after time, that

(continued...)

*Conclusion*

The proper judicial inquiry in this case is limited to whether the Plan satisfies the specific requirements of the Land Use Article with regard to the Plan's substantive content. The circuit court addressed this issue, in meticulous detail, in its opinion and concluded that the Plan complied with every relevant standard contained in the Land Use Article.

As we have mentioned, our review of the circuit court's judgment is *de novo.* But that does not necessarily mean we must "indulg[e] [in] the conceit that we could somehow say it better" than did the circuit court. *Sturdivant v. Maryland Dep't of Health & Mental Hygiene*, 436 Md. 584, 588 (2014). In lieu of attempting to gild the lily, we adopt the relevant portion of Judge Adams's well-reasoned and well-researched opinion as our own and attach it as an appendix hereto.[21]

**THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY IS AFFIRMED.**

**APPELLANTS TO PAY COSTS.**

---

[20](...continued)
the Court's 'strong' and 'established' policy is to decide constitutional issues only when necessary.'" (quoting *Burch v. United Cable*, 391 Md. 687, 695–696 (2006)).

[21]We have made a few minor formatting changes to Judge Adam's opinion. The footnote numbering in the attached excerpt tracks the numbering in the original.

\* \* \* \*

The Court has thoroughly reviewed the Town's Plan and the MGE, and determined that they do conform to the statutory requirements.

### The Municipal Growth Element - § 3-112(a)

This Court finds that the MGE does comply with the requirements of the Maryland Land Code Statute, § 3-112(a). The MGE is an extensive and comprehensive discussion of all of the factors enumerated in § 3-112; it clearly, specifically, and substantially discusses or explains every element. The MGE contains multiple supporting tables, charts, maps and analyses. The Court also notes that the MGE would have complied with the former language of 66B § 3.05(a)(4)(x), which states that the MGE shall "include consideration."

The Plaintiffs argue that the information supplied in the MGE is insufficient, and have attached the affidavits of experts who provide their opinions regarding how the MGE's conclusions should comply with the statute. The Plaintiffs' argument that these affidavits demonstrate a factual dispute over statutory compliance, rather than a legal dispute, is specious. It is not within the authority of this court to determine the merits of the various conclusions reached in the plan, but simply whether the Town's MGE complies with the statutory language by including every element. This Court finds that the

MGE fully complies with the requirement elements set forth in § 3-112(a), and will

provide the following examples of the MGE's satisfaction of those elements.

**[LU §] 3-112 (a)(1) The Municipal Corporation's:**
  **(i)     future municipal growth areas outside the existing corporate limits**
  **(ii)    past growth patterns**
  **(iii)   capacity of land areas available for development, redevelopment, and in-fill**

Section III, paragraph C, from page 14 through 18 of the MGE discusses

extensively the intended future growth areas outside existing New Market limits. Past

Growth Patterns are addressed by Table 1 and 2 on page 6 and 7 of the MGE, along with

accompanying analysis, discussing population change since 1930. Section II, Paragraph B

on page 7, discusses changes in land use pursuant to historical growth. Table 3 on page 11

of the MGE addresses the capacity of municipal land available for development,

redevelopment and in-fill.

**[LU §] 3-112 (a)(2): the land area needed to satisfy demand for development at densities consistent with long-term development policy**

This element is clearly addressed in Table 4 on page 15 entitled "Land Needs."

The Table displays the Town's estimates of land needed to keep up with population

growth estimates.

**[LU §] 3-112 (a)(3): the relationship of the long-term development policy to a vision of the municipal corporation's future character**

This element is addressed by Section VII: "Relationship of New Market's Long Term

Development Policy to the Vision of its Future Character." This extensive section explains at page 33-34 that, among other things, that the Master Plan will be re-evaluated every five years, and that a Development Master Plan will be required for every development, in order to achieve a unified scheme of development for an entire parcel, consistent with the provisions of the Town's plan.

**[LU §] 3-112 (a)(4): rural buffers and transition areas**

The Town addresses this element throughout the MGE. Specifically, the MGE states on page five, regarding its own Visions, "Responsible changes in land use patterns will result in health, safety, and environmental protection and enhancement, especially when streams and their buffers are restored, forested areas are connected, and other sensitive areas are maintained or restored to their natural state."

**[LU §] 3-112 (a)(5): protection of sensitive areas that could be impacted by development planned within the proposed municipal growth area**

The Town has given significant consideration to the protection of sensitive areas.[5] Section V of the MGE beginning on page 29, entitled "Protection of Sensitive Areas In

---

[5] Sensitive areas are defined as:
    (1) a stream or wetland, and its buffers
    (2) a 100-year flood plain;
    (3) a habitat of a threatened or endangered species;
    (4) a steep slope;
    (5) agricultural or forest land intended for resource protection or conservation; and
    (6) any other area in need of special protection, as determined in a plan.
Md. Land Use Code Ann. § 1-101 - Definitions

and Near New Market" consists of paragraphs (A) through (E) which list both general plans and specific initiatives to enforce protection of sensitive areas from planned potential development in compliance with § 3-112(5).

Paragraph (A) is dedicated to discussion of protection of the Town's natural water supply. Paragraph (B) explains that the Town will continue to implement zoning practices "which protect and enhance the environment." These practices include, among other things, directing development activity away from 100 year annual and historic floodplains, preventing construction of large contiguous paved areas unless adequate measures are ensured to reduce runoff; encouraging disposal of storm water on the development site rather than directing it to draining courses, and limiting development in designated aquifer recharge areas. Paragraph (C) explains the steps that will be taken to address open space issues. Paragraph (D) explains: "The Town has adopted and will maintain standards for development on or near wetlands and floodplains, so as to protect these critical resources." These standards include a prohibition of development within a 100-year flood plain, and a 25-foot building setback in areas adjacent to these floodplains. The MGE explains in paragraph (E) that "New Market will establish a Conservation Committee whose primary function will be to advise the Planning and Zoning Commission." According to the MGE, this Committee will also function to oversee, review and coordinate various conservation practices, among other things.

27

**[LU §] 3-112 (a)(6) population growth projections**

Population growth projections are clearly expressed in Table I and Table 2 on pages 6-7 of the MGE, which display estimated projections of the New Market population through 2030.

**[LU §] 3-112 (a)(7) pubic services and infrastructure needed to accommodate growth within the proposed municipal growth areas, including those necessary for:**

    **(i)    libraries**
    **(ii)   recreation**
    **(iii)  water and sewage facilities**
    **(iv)  public safety, including emergency medical response**
    **(v)   stormwater management systems sufficient to ensure water quality both inside and outside the proposed municipal growth area**
    **(vi)  public schools sufficient to accommodate student population consistent with State rated capacity standards established by the Interagency Committee on School Construction**

    i.    This element is discussed within section IV of the MGE, which begins on page 18. The town explains on page 22 that it does not have a library, and that according to data from the American Library Association it is currently not large enough to require a public library.

    ii.   Recreation is discussed in detail on pages 26-27 of the MGE. The Plan provides Table 11 to demonstrate additional contributions to lands for parks based on County standards.

    iii.  Water and sewage are discussed on page 28 of the MGE.

    iv.  Paragraph D of Section IV addresses public safety on page 28-29, and

explains that fire and emergency medical protection are provided by volunteers and no lees than two full time County Fire and Rescue Service employees.

v.      Article IV, Section F, points out on page 26 that Frederick County now plans, reviews and inspects stormwater systems for the Town, and that the Town has adopted test Maryland Department of the Environment regulations governing stormwater.

vi.      Paragraph B, beginning on page 20 to page 22, is dedicated to discussion of public schools. It discusses the current and projected capacities for its public schools, pursuant to projected growth and acquisitions. On page 28 the MGE proposes redistricting of the schools to resolve issues of overcrowding.

**[LU §] 3-112 (a)(8) any burden on services and infrastructure for which the municipal corporation would be responsible for development in areas near to and outside of the proposed municipal growth area**

The Town fulfills this element in Section IV, paragraph H on page 27 of the MGE, where it states, "No burdens on New Market-provided services and infrastructure lying outside the preferred Annexation Area can be identified at this time."[6]

**[LU §] 3-112 (a)(9) anticipated financing mechanisms to support necessary public services and infrastructure**

Section VI of the MGE on page 32, entitled "Financing Infrastructure Expansion," discusses the Town's plans for financing expansion, complying with § 3-112 (a)(9). This

---

[6] It cannot be said that the Town did not fulfill this section simply because they concluded in the MGE that they could not identify any additional burdens. Sec. 3-112 (a)(8) does not require that the Town find a burden.

section proposes, in part, that development of necessary infrastructure will be funded by private developers, and not by public funds.

**[LU §] 3-112 (b) Technical assistance. -- On request of a municipal corporation, the Department of Planning shall provide technical assistance for the purposes of developing the municipal growth element of the comprehensive plan**

The Maryland Department of Planning, as evident by their comments to the Town of New Market published in the 2010 and 2011 supplements, has communicated consistently with the Town and provided extensive input regarding the Plan and MGE.

The Plaintiffs also allege that the Town's Plan fails to comply with § 3.05(a)(4)(iii)(l)&(2). This section has now been codified at Md. Land Use Code Ann. § 3-105. The relevant language alleged by defendants now states:

> **(b) Required contents. - The transportation element shall:**
> **(1) propose, on a schedule that extends as far into the future as is reasonable, the most appropriate and desirable patterns for:**
> **(i) the general location, character, and extent of channels, routes, and terminals for transportation facilities; and**
> **(ii) the circulation of Individuals and goods;**
> **(2) provide for bicycle and pedestrian access and travelways; and**
> **(3) include an estimate of the use of any proposed improvement.**

The MGE and the Plan address every one of these elements in detail. The transportation explanation Section IV, paragraph A beginning on page 18 of the MGE, is devoted to discussing improvements to New Market's transportation system, supported by traffic studies. This Section discusses the most appropriate and desirable patterns, and the Plan discusses estimates of this proposed improvement.

Pedestrian and bicycle friendly design is certainly provided for. For example, is addressed at page 5, of the Plan: "we choose to accept orderly, compact, phased and compatible growth in our Planning Area as our alternative to the suburban sprawl, automobile-dependent development that has consumed hundreds of thousands of acres of valuable land across our country. This pursuit of compact, pedestrian friendly design is repeated on page 20 of the Plan in section 2 of the Town's first Vision.

While the list of examples provided by this Court is not exhaustive or inclusive of every example, it demonstrates the MGE's inclusion of the elements enumerated in § 3-112. The Court finds that the Town's MGE has meaningfully discussed every element required by § 3-112, so that it has "included" them in compliance with the statute.

## The Visions - § 1-201

The Court finds that the Plan does sufficiently implement the visions and comply with the requirements of Md. Land Use Code Ann. § 1-201. After review of the Plan, the Court finds that the Plan specifically, clearly, and substantially addresses and implements each of the visions. The Town has seriously considered these elements in the formation of its Plan, and the Plan expressly considers them the foundation of the planning process. After listing and explaining the visions, including their requirement in a comprehensive plan, the Town's Plan states at page 7, "These visions give local jurisdictions a succinct statement of Maryland's priorities for their plans. However, the visions are intended as

the beginning of the planning process, not the end. New Market starts with the visions, applies them to its own situation, and establishes it [sic] own priorities and paths to realization."

Md. Land Use Code Ann. § 1-201 reads: "In addition to the requirements of § 3-201(a) and (b) of this article, a planning commission shall implement the following visions through the comprehensive plan described in Title 3 of this article..." Sec. 1-201 lists twelve visions which must be implemented. The Court will provide examples of the Plan's satisfaction of each of the elements.:

**(1) Quality of Life and Sustainability: a High Quality of Life Is Achieved Through Universal Stewardship of the Land, Water, and Air Resulting in Sustainable Communities and Protection of the Environment**

This first vision is discussed consistently throughout New Market's Plan, but it is readily apparent in the Town's own fourth vision, discussed beginning on page 48. The Plan states on pages 48 - 50 that the Town shall encourage stewardship of the Chesapeake Bay and its tributaries, shall take every step possible to ensure the quality of its groundwater and surface water sources, and encourage land use designations promoting conservation and open space issues.

**(2) Public Participation: Citizens Are Active Partners in the Planning and Implementation of Community Initiatives and Are Sensitive to Their Responsibilities in Achieving Community Goals**

The Plan has ensured that citizens are active partners by including citizens on its

Planning Commission and by holding meetings where the citizens were present for public comment and input. Additionally, paragraph C of Section V of the Plan describes on page 30-31 the methods that New Market property owners will have to be compensated by development, and suggests that Town will "look to the creativity of its citizens and neighbors to bring this objective to fruition."

**(3) Growth Areas: Growth Is Concentrated in Existing Population and Business Centers, Growth Areas Adjacent to These Centers, or Strategically Selected New Centers**

The Court finds multiple instances of the Town's implementation of this vision of growth near existing population areas. For example, at page 5, the Town states in its Plan, "we choose to accept orderly, compact, phased and compatible growth in our Planning Area as our alternative to the suburban sprawl, automobile-dependent development that has consumed hundreds of thousands of acres of valuable land across our country."

**(4) Community Design: Compact, Mixed-use, Walkable Design Consistent with Existing Community Character and Located near Available or Planned Transit Options Is Encouraged to Ensure Efficient Use of Land and Transportation Resources and Preservation and Enhancement of Natural Systems, Open Spaces, Recreational Areas, and Historical, Cultural, and Archaeological Resources**

The Town's Plan consistently embraces this vision of compact design with pedestrian friendly design. As stated above, at page 5, the Town states in its Plan, "we choose to accept orderly, compact, phased and compatible growth in our Planning Area as our alternative to the suburban sprawl, automobile-dependent development that has

consumed hundreds of thousands of acres of valuable land across our country." This pursuit of compact, pedestrian friendly design is repeated on page 20 of the Plan in section 2 of the Town's first Vision.[7] Section 3 of the First Vision proposed by the Town also describes the Town's goal of preserving its architectural heritage.

**(5) Infrastructure: Growth Areas Have the Water Resources and Infrastructure to Accommodate Population and Business Expansion in an Orderly, Efficient, and Environmentally Sustainable Manner**

The Plan consistently states that it is important to ensure the water resources and infrastructure necessary to accommodate population and business expansion. For example, on page 37 of the Plan, the Town explains two methods that it will consider to ensure adequate infrastructure is in place: an Adequate Public Facilities Ordinance and a Developer's Rights and Responsibilities Agreement. The Plan explains at page 37 that the Adequate Public Facilities Ordinance would place a constraint on development until the necessary infrastructure is complete. The Plan explains at page 38 that a Developer's Rights and Responsibilities Agreement is a contract between the municipality and private developer that grants benefits to the developer, in exchange for construction of necessary public services by the developer. The Plan explains that the Town will consider both.

**(6) Transportation: a Well-maintained, Multimodal Transportation System Facilitates the Safe, Convenient, Affordable, and Efficient Movement of People, Goods, and Services Within and Between Population and Business Centers**

---

[7] The Town, in its Plan, proposes four new "Visions" in addition to the twelve visions required by § 1-201.

The Town echoes this language on page 9 of the MGE, where it states "A central goal of this Plan is to provide a safe, efficient, and attractive transportation system for the Town and region." Section IV, paragraph A beginning on page 18 of the MGE, is devoted to discussing improvements to New Market's transportation system, supported by traffic studies.

**(7) Housing: a Range of Housing Densities, Types, and Sizes Provides Residential Options for Citizens of All Ages and Incomes**

Section V of the Plan, at page 51 discusses a wide distribution of housing types, including single family homes, duplexes, historic district residential. Additionally, Section 2 of the Town's first "Vision" discusses at page 27 the Towns Plan to reach a cooperative plan with Frederick County which should achieve "housing for all income levels and a reasonable allocation of affordable housing."

**(8) Economic Development: Economic Development and Natural Resource-based Businesses That Promote Employment Opportunities for All Income Levels Within the Capacity of the State's Natural Resources, Public Services, and Public Facilities Are Encouraged**

The Town's Plan and MGE pursue a wide range of employment opportunities. Section 2 of the Town's first "Vision" discusses at page 27 the Town's Plan to reach a cooperative plan with Frederick County which aspires to achieve land designation areas, including commercial, industrial, and institutional uses that are "planned to provide for the economic and employment needs of the area." Additionally, the Town has explained

on page of the MGE that "Land appropriate for commercial, light industrial, and office/research development now exists and annexation studies shall be undertaken to examine bringing these possible employment locations into New Market. Industry must have access to transportation facilities and New Market occupies a key Interstate Highway location. Annexations that result in a regional balance between housing and employment opportunities, reduce potential commute distances, and are consistent with the visions and policies will be welcome."

**(9) Environmental Protection: Land and Water Resources, Including the Chesapeake and Coastal Bays, Are Carefully Managed to Restore and Maintain Healthy Air and Water, Natural Systems, and Living Resources**

The Plan states on pages 48 -50 that the Town shall encourage stewardship of the Chesapeake Bay and its tributaries, shall take every step possible to ensure the quality of its groundwater and surface water sources.

**(10) Resource Conservation: Waterways, Forests, Agricultural Areas, Open Space, Natural Systems, and Scenic Areas Are Conserved**

The Plan is replete with discussion of conservation and protection of resources required by the 10th vision. For example at page 9 of the MGE the town states: "Natural Features Should Determine Design: This means all development should be environmentally sensitive and that the natural character of land to be developed should be maintained. This includes development techniques commonly known as the conservation design, and at the lot level, environmental site design. Streams and wetlands are among

the most sensitive features. They must have wide, protective natural buffers and development must be designed not only to minimize impacts to these features, but also to restore natural functions."

The MGE explains on page 30 that the town will consider various land use designations, such as Open Space Reserve, Agricultural Reserve, and Conservation, and proposes incentives for owners of land in conservation areas. On page 31 the MGE explains that the Town will establish a Conservation Committee, as described above.

**(11) Stewardship: Government, Business Entitles, and Residents Are Responsible for the Creation of Sustainable Communities by Collaborating to Balance Efficient Growth with Resource Protection**

The Plan demonstrates multiple examples of this collaboration to balance efficient growth with resource protection. As mentioned in multiple sections above, the Plan has clear goals and planned methods of conservation and resource protection. Additionally the goal of efficient growth, pursuant to Maryland Smart Growth policies, is consistently stated throughout the Plan. For example, section 2 of the Plan's second stated Vision, entitled "Encourage cooperative and coordinated planning in the New Market region for the benefit of both the town and county," espouses those Smart Growth policies. On page 26, Section 2 of this Vision cites those goals of "calling for directing economic development preventing sprawl outside growth areas, limiting capital improvements in rural or non-growth areas preserving open space and environmentally sensitive areas, and

promoting mixed use development."

**(12) Implementation: Strategies, Policies, Programs, and Funding for Growth and Development, Resource Conservation, Infrastructure, and Transportation Are Integrated Across the Local, Regional, State, and Interstate Levels to Achieve These Visions**

Vision 12 is addressed throughout the Plan. For example, paragraph C of Section 2 on page 9 of the MGE states that New Market must join with all municipalities in the region, local businesses, and residents in adopting its plan. Section VI, paragraph B discusses on page 32 that the Town will work with the County and the State to "plan, fund, and construct the community facilities, infrastructure, and transportation improvements necessary to correct existing inadequacies within the community and to facilitate development in New Market Planning Area as a designated growth center within the County."

These visions are broader and more theoretical ideas than the elements enumerated under § 3-112, and § 1-201 does not require any form or location of adoption in the Plan. They do, however, echo some of the language set forth in the elements to be included in the MGE. The Court has reviewed each vision, and is satisfied that the visions are each implemented throughout the various sections of the extensive Plan.

**Additional Allegations - § 3-201(b)(2)**

In Section C of the First Cause of Action in their Amended Complaint, Plaintiffs allege that the Town's Comprehensive Plan fails to "provide for' certain statutory

requirements" according to 66B § 3.05(c)(4). 66B § 3.05(c)(4) has been recodified under the New Land Use Article as Md. Land Use Code Ann. § 3-201(b)(2). The new section is largely the same; however the old 66B § 3.05(c)(4)(vii) regarding "the promotion of good civic design and arrangement" has been rearranged in the new § 3-201. This language may be found now in § 3-201(b)(1), which states, "a plan shall promote: (1) good civic design and arrangement.["] Md. Land Use Code Ann. § 3-201(b)(1)(i)[.] The requirements which the Plan "shall provide for," pursuant to § 3-201(b)(2), are largely reworded synopses of the elements required under §3-112, or the visions required under § 1-201.

The Court does not agree with the Plaintiffs that the Plan fails to provide for the enumerated statutory requirements; the Plan and the included MGE do indeed provide for these statutory requirements as explained with examples in the above sections, as well as the following explanations. Additionally, the Plan sufficiently accomplishes promotion of "good civic design" pursuant to Md. Land Use Code Ann. § 3-201(b)(1)(i).

**1. Transportation Needs**

Along with the proposed northern bypass road, the MGE and the Plan cover transportation needs with specificity. Beginning on page 18, Section IV is entitled "Growth's impact on public services and facilities." It is devoted to discussion of current and estimated future traffic needs pursuant to growth.

## 2. The Promotion of Public Safety

As mentioned above, the MGE discusses public safety at Section IV Paragraph D, page 23. The Plan also expands on the discussion in Paragraph D by explaining its participation in the Frederick County Sheriff's Department Extra Duty Hours program, and discussing the necessary expansion of police force relative to expansion of the population.

## 3. Light and Air

The Town consistently explains that achieving open air and the preservation of existing natural features are goals of the Plan. For example, paragraph B of Section II at page 9 states "The Town does not want garages to be the most prominent feature of houses, nor does it want streets that are overly wide and huge parking lots that are unrelieved seas of asphalt . . . Every development must provide significant, usable open space as an integral part of projects and neighborhoods - not afterthoughts. This also means the Town will work to improve existing open space to create green corridors of connected open space."

## 4. The Conservation of Natural Resources

As stated in the sections immediately above, the Plan advocates for conservation in multiple instances. For example, the MGE states at page 9, "Natural Features Should Determine Design: This means all development should be environmentally sensitive and

that the natural character of land to be developed should be maintained. This includes development techniques commonly known as the conservation design, and at the lot level, environmental site design. Streams and wetlands are among the most sensitive features. They must have wide, protective natural buffers and development must be designed not only to minimize impacts to these features, but also to restore natural functions."

The MGE also explains on page 30 that the town will consider various land use designations, such as Open Space Reserve, Agricultural Reserve, and Conservation, and proposes incentives for owners of land in conservation areas. On page 31 the MGE explains that the Town will establish a Conservation Committee.

**5. The Prevention of Environmental Pollution**

As stated above, the Plan and MGE state in multiple instances that any development will be environmentally sensitive, and should involve on-site methods to reduce and prevent pollution.

**6. The Wise and Efficient Expenditure of Public Funds**

It is clear throughout the plan that the Town has carefully considered appropriate and efficient financing methods, as discussed above.

For example, Section VI of the MGE on page 32, entitled "Financing Infrastructure Expansion," discusses the Town's plans for financing expansion, complying with § 3-112(a)(9). This section proposes, in part, that development of

necessary infrastructure will be funded by private developers, and not by public funds.

**7. Adequate Public Utilities; and 8. An Adequate Supply of Other Public Requirements**

As mentioned in above sections, the Plan and MGE both discuss plans to ensure the existence of adequate public utilities and infrastructure before development, such as the suggested Adequate Public Facilities Ordinance and a Developer's Rights and Responsibilities Agreement. The MGE also clearly states on page 32 at Section VI, paragraph B, that "No new development will be approved within the Planning Area unless it can be determined that adequate public facilities and infrastructure are in place or are planned and funded for construction within a reasonable time period in conjunction with the proposed development."

* * * *